Your Honors, good morning, and may it please the Court, my name is Jeff Dobbins, and I represent the George E. Falling Company of Jefco. Your Honors, the Wallaces, the plaintiffs in this case, purchased a drill string from Jefco for a little less than $83,000. Over the course of six years of drilling, some six or seven pieces of that 75-piece string broke. Based on the alleged flaw in workmanship, the Wallaces sued. Despite the fact that they used the drill string, at least through the time of trial, despite the fact that they continued to use it all the way up to that point, despite the fact that they never even went out to try and purchase a new drill string, the jury awarded them nearly $850,000 in lost profits. That massive award was not supported by any substantial evidence, and the district court's denial of Jefco's notion for a new trial on damages was an abuse of discretion. I want to address this morning two significant ways in which the evidence offered by the Wallaces failed. Either failure should have resulted in the grant of a new trial. First of all, the evidence failed to explain why the Wallaces, faced with the alleged losses of the magnitude that were asserted, failed to mitigate their losses by purchasing a new drill string. And second of all, the expert testimony on lost profits was so internally flawed that it failed to support the award to the degree that's necessary under Oregon law. The testimony should have been excluded, or at least the motion for a new trial should have been granted. With respect to the issue of mitigation, under Oregon law, a party facing a loss may only recover those costs that could not reasonably be avoided. The party has to act to cover in good faith and without unreasonable delay. Now in this case, as early as March of 1998, the plaintiffs were alleging losses in the hundreds of thousands of dollars. If you look at ER 85, you can see a letter from the Wallaces' counsel to Jefco's counsel saying they're losing hundreds of thousands of dollars, we're almost out of business. This was in 1998. By early 1999, they were alleging that they'd lost nearly a million dollars. Now, their evidence at trial demonstrated that the Wallaces could have gone out and purchased a new drill string. In fact, the Wallaces themselves wrote to Jefco in early 1999 and said, you can go out and buy a new drill string for just $40,000. We can get it in a couple of months and all of our problems will be solved. The great mystery in this case, Your Honors, is why in the world of Wallaces did he do that themselves? Counsel, is that evidence presented to the jury? The evidence that the drill string was available? Yes, absolutely. And the jury found against the client on that issue? The jury apparently concluded that the lack of mitigation was something that was in some way excusable. And on what basis should we overturn that finding by the jury? Because, Your Honor, if the principle of appellate review means anything, this is a situation in which reversal is appropriate. And I understand that this isn't something that this reversal of the district court's Reversal of what? Reversal of law or question of fact? Okay. Well, and this is admittedly, this is ultimately a question of fact. But it's a question of fact which, under the standards for whether or not the district court should have granted the new trial motion, and under this court's principles of appellate review of that decision, it is appropriate for this court to reverse the district court's decision denying the motion for a new trial. If this court is convinced, if this court is convinced, and I agree, you have to be absolutely convinced that the district court's decision was incorrect. And let me explain. Is it incorrect or? I'm sorry. We're thinking along the same lines. By what standard of review? The standard of review that this court uses is essentially, and I guess the way that I would characterize it is essentially should the district court have essentially granted a motion for a directed verdict on the question of discretion. Within its discretion. Excuse me? Within its discretion. No. Whether this court is convinced that the district court's exercise of discretion, i.e., to decide not to grant that, was inappropriate. So it's an abuse of discretion standard. That's correct. Which is a high standard. It is. It is an extremely high standard. Even if all three of us disagreed with the district court, is that an abuse of discretion? The mere fact of disagreement, no. Certainly not. What this court needs to have is it needs to walk away with a firm and definite conviction that the district court's denial of the motion for a new trial was incorrect. Clearly. That's a lot more than mere clear and definite conviction. That's a lot more than a mere disagreement. And I freely admit that point. We're not here saying that this court is simply sitting as, you know, third, fourth, or I guess 13th, 14th, and 15th jurors. We're highly aware of the fact that this is an extremely unusual relief that Jeffco is seeking. But given that, there must be situations, if the appellate review of this type of a situation is going to mean anything, there must be situations in which the appellate courts will reverse. And this is one of those situations, and let me explain why. In the issue of mitigation of damages, does the wrongdoer have any duty at all to mitigate, help the innocent party mitigate damages? Under the UCC, Your Honor. See, what if the injured party is so poor that they can't do anything except suffer what they suffered as a result of the wrongdoing of your client? And if that's the case, Your Honor, then we lose. Then you have a duty. If that's the case. Well, I wouldn't say that it's a duty. I would say that the way that the law is phrased is that the defendants are obligated to pay those consequential damages that cannot reasonably be avoided by the buyer. And you could at least be mitigating these damages. Well, but there's a different point. Because it's in your business to furnish those pipes. And you could have furnished pipes immediately. And, Your Honor, this is the situation. This is where we fall into a significant disagreement with the district court's order on the new trial motion because the district court took a similar perspective. The district court said, Jeffco could have solved this problem immediately. It could have avoided these damages immediately. And that may very well be the case. But that is not under the law the defendant's obligation. Under the law, it is the plaintiff's obligation, and this is under Oregon Law 72.7120 and 71.7150. It is the plaintiff's obligation to take steps in good faith and without unreasonable delay to cover for any losses that may be suffered. Now, the question then is, were there steps that the Wallaces could have taken in good faith and without unreasonable delay that would have avoided these problems? Well, so could you. So could your client. But again, Your Honor, that is not the defendant's obligation. If the plaintiff was able, and this is exactly what the law says, Oregon Revised Statutes 72.7120 and 71.50 say that the only consequential damages that are awardable are those consequential damages that are reasonable under the circumstances and specifically only those damages that could not have been avoided in an exercise of good faith and without unreasonable delay. The obligation is to spend good money after bad money. Well, and that is the question. Is that what was going on here? First of all, it's spending good money to get $150,000 or $200,000 a year. It's not a situation, Your Honor, where the plaintiffs were going to go out there and not get anything because the plaintiffs knew, as I pointed out right in the beginning, they knew that they were losing that much money every year. And if that was the case, they had the obligation to go out there and take reasonable steps to prevent those losses from occurring. So your position is that, you know, if the plaintiffs were of the view that they had already paid for one piece of equipment that was faulty and they shouldn't have to pay for a second piece of equipment to replace a faulty piece that through no fault of their own, that was not a reasonable posture for them to take. That's your argument. Absolutely, Your Honor. And the jury could have legitimately ruled against your argument. They could have found that against your argument. And that's where I disagree with you. Apparently, they did. And that's where I disagree with you, Your Honor, because although the jury did, there are always situations, we know that there are situations in which the trial court and, in fact, the appellate court takes these questions away from the jury because the evidence that is submitted is insufficient as a matter of law to support the findings that the plaintiffs are alleging. And let me tell you why that's the case here. First of all, there's basically two excuses for why the Wallace's said that they couldn't mitigate here. The first one is the one that the district court used, which is basically that the Wallace's didn't mitigate because it made sense to continue pursuing replacement from Jeffco. They were in negotiations with Jeffco. They thought they could get a new drill string from them. Why bother putting money into buying a new drill string? But that argument only holds up up until November of 1998, because after November of 1998, when Jeffco returned the drill string, having been tested, when they returned it to the Wallace's, at that point in time, the Wallace's knew or should have been perfectly aware that Jeffco was not going to be replacing that drill string. From that point in time forward, the only remedy that the Wallace's were going to have to prevent the bleeding in their business was to buy a new drill string. That would have cost approximately $40,000. Which would have cost $40,000. In addition to the $30,000 they had already paid. Right. And that takes us to the next question. So the issue becomes whether or not the Wallace's were required to expend approximately $70,000 to get $150,000 in profit. That's in the future. Well, it's not even $150,000 in profit, Your Honor. At least under the verdict, it's $850,000. But you said $150,000, which is what they had projected. Each year, Your Honor. Each year. Yeah. It's $150,000, $150,000 to $2,000, $200,000 in losses every year. And that's why the decision not to spend the $40,000 is so inexplicable. If you look in our brief at page 31, note 17, in our opening brief, we go through a lot of the evidence that was in the record. And this is really the only evidence that's in the record on this question of financial wherewithal is the sort of unsupported statement by Mr. Wallace. He said we couldn't afford it. He basically echoed that in two places. That's a credibility issue. Either the jury believed him or didn't believe him. But then what you have in contrast with that is you have the unrebutted documentary evidence. And it's a substantial amount of documentary evidence. If you look in that, if you look at how the Wallaces were spending the money in what is a sole proprietorship, it's important to remember that because these sound like household expenses, but it's a sole proprietorship. What were they doing? In 1996, they bought a $54,000 Lexus. At the end of 2000, they spent $15,000 on a new deck. They paid for it in cash? I don't know exactly what it is, Your Honor, but if they borrowed it, they certainly could have borrowed the money to buy a new drill string. And then they would have had a lot more. They would have essentially recovered that money in less than half a year's work. Isn't that a question for the jury as to whether that was reasonable or not? In situations where there's adequate evidence, Your Honor, it may be a question for the jury. And that's just fundamentally our argument here is that the only evidence, the only record evidence here that explains why the Wallaces did not go out and replace this drill string when they were facing losses of the magnitude that they were facing is the unsupported testimony of Mr. Wallace that basically amounts to ten words or less than that, I couldn't afford it, that's it. But in contrast to that, we have the documentary evidence. We have the facts that are out there that they spent the money. They spent $15,000 on a new deck. They spent some $23,000 on other home improvements in the year 2000 alone. If you look at the evidence that's set out and that's described in footnote 17 of our opening brief, you can see the substantial amounts of cash that were moving back and forth on the part of the Wallaces. Now, the Wallaces in their briefing said, oh, well, that was just because we were in desperation measures. That's not evidence that was in front of the jury. All the jury had in front of it was the documentary evidence and the unsupported assertion of Mr. Wallace that he couldn't afford it. Now, in light of that testimony and in light of the fact that we know that there was the money out there, we know that the money was there and available to use to stem these losses, I would suggest that in that sort of a situation, this is precisely the case in which it should have been appropriate to reverse the jury's verdict, to vacate the jury's verdict, and grant an award for a new trial on this question of mitigation. Because if this isn't the right case for that, I don't know what is. I really don't know what is. Let me point out another issue with respect to the question of damages because I want to try and reserve some time here before my time runs out. The other question is just how much money did the Wallaces lose as a general matter, even on this question of mitigation? The plaintiff is obligated to demonstrate their losses to a reasonable certainty, and the essential ingredient under Oregon law of a reasonable certainty is that there has to be supporting data in favor of the allegations of lost profits. And I would suggest that here, the only expert testimony that the jury could have relied upon in awarding the award that they did, which was $850,000, more than one of the Wallaces' experts, was the testimony of Jim Dickey. And you have to understand how Jim Dickey calculated lost profits. And I would suggest, and this is the testimony that was submitted to the court, that it was no better than randomness. Let me show you, and I have an exhibit that I provided an extra copy of this to the court. This is just a blowup of page 131 in the excerpts of record. This is sort of the core document that explains what it was that Mr. Dickey did when he was trying to project the lost profits that were suffered by the Wallaces. He took their actual income, their actual profits from 1986 through 1996, and those are the bars on that graph, 1986 to 1996. And then he said, well, what are they going to earn in the future? And all he did, and this is the testimony at trial, is he went into the Microsoft Excel spreadsheet, he clicked on the button that said set trendline, and he chose what is called this log normal trendline. Now, there's a lot of other trendlines, according to the testimony that they could have seen. He could have projected in an exponential trendline, which would have started down here, and would have shot up to infinity over the course of the years. He could have projected in a straight line trendline, which would have just been a straight line, or, as the testimony at trial indicated, he could have projected a parabola, which basically would have brought it up and then sent it down over time, because as you see, the Wallaces' profits were dropping off in 1995 and 1996 before the Jeffco drill string ever got in there. There is no explanation in the record for why Mr. Dickey chose that line rather than any other line that was possible. Whether the lines that shot up to infinity or whether the lines that dropped down well below the zero line. There's no explanation there. But counsel, isn't the jury free to accept or reject the expert's testimony to the extent it's helpful? The jury is free to accept or reject the expert's testimony. You're right, Your Honor. But again, we're in a situation in which internal to the testimony that's offered by the plaintiffs, there are flaws that are so substantial that it does not meet the legal requirement. The question under Oregon law, if you look in the decisions in Monaco and in Willamette Quarry, say that you can base a projection of lost profits on expert projections based on tests performed under substantially similar conditions. And that is simply not what happened here. Now, I understand the court's belief that this information was presented to the jury, and maybe the jury decided otherwise. But the question is, is this court convinced, does this court have a definite and firm conviction that the jury's decision to award $850,000 in lost profits for a $33,000 flawed drill string was so incorrect that the district court actually should have granted the motion for a new trial? How much was requested by the plaintiffs and damages? The plaintiff's, Mr. Dickey's testimony was that he believed that the plaintiffs were entitled over the course of ten years, he projected all the way out to 2006, that they were entitled to $1.6 million in damages. And so the jury didn't really give all that the plaintiffs requested. So doesn't that indicate some deliberative decision on the part of the jury in terms of the mitigation issue and the expert testimony issue to show that the jury probably weighed all of the evidence and came to a verdict that it felt properly reflected the state of the evidence? I see your perspective, Your Honor, and I would have to disagree for this reason. Mr. Dickey could have walked in there and he could have used the exponential trend line and said the Wallaces actually lost $10 million. And the jury could have come back and said, well, you know, I don't think it's $10 million, it's $5 million. There would be no support for that testimony. Just like there's no support for the testimony here that the Wallaces were entitled to $1.6 million in damages. The underlying evidence has to be reasonably supported. The underlying evidence has to be at least plausible and plausibly believable. But doesn't the district court do that originally in the gatekeeping function that the district court serves? And then once the district court has determined that the evidence is admissible, then it's up to the jury to weigh it.  There was a motion in limine before trial that was never ruled on by the district court. He basically reserved the question for trial and then the evidence was submitted to the jury and it was never followed up on. The argument was that there was essentially no support for the projection of profits that was at issue here. And the district court didn't rule on that. And I would suggest that in fact, you know, again, the testimony regarding the amount of lost profits that was out there was no better than Jim Dickey walking in there and throwing the dice randomly and saying that's how much money they were entitled to. Was the expert cross-examined on the points you're making? Yes, Your Honor, he was. Did the defendant present evidence through an expert? There was, yes. Yes, Your Honor, there was evidence presented through an expert. Judge Penner has said that you could have mitigated these damages simply by honoring your warranty. Well, Your Honor, I would suggest that under the UCC, and I think we've talked about this already, under the UCC the obligation to mitigate, or at least the question for how much money you're going to get, is an obligation that turns on the plaintiffs. In a perfect world, yeah, maybe Jeffco would have been a better, maybe they would have had better customer service. Just forget about the warranty then. Well, but again, Your Honor, it's an amoral view and I agree that it doesn't necessarily make sense in the world of what makes sense as far as customer service. is concerned, but the law does not require the defendant to mitigate the damages. The law requires the plaintiff to do so if the plaintiff can do so reasonably. But the law does require a defendant to live up to its warranties and that was the purpose of the lawsuit. And appropriate damages should have been paid, but these were not appropriate damages. And I'll try and reserve my remaining minute. All right, thank you, counsel. Thank you. May it please the Court, Your Honors, my name is Gene Hallman and I represent the plaintiffs in this matter. I'm going to first address the question of failure to mitigate. I'll address them in the same issues that the defendant brought them up. And I'd like to, if it would be helpful to the Court, because I think this has some bearing on the mitigation or cover issue. I think it's important to the Court to realize, number one, this is a specially manufactured product. This is not a product that you can go to Fred Meyers and buy. This is a product that's manufactured by maybe five companies in the country, specially manufactured. With the Court's indulgence, I have to do this on a chair because it's heavier than I can normally handle. But I think it's helpful to see the manufacturing process to see how this whole thing works. This is the drill string. This piece of tubing on this side, which the Wallace has asked to be extra thick, so it's .42 instead of .33, is actually 25 feet long. Obviously, this has been cut off. And this side is a threaded piece with a female end and then the other side is the male end. And the drill unit is then, that piece is inserted into the ground. And to build a 1,000 foot or 1,500 foot drill string, you continue to screw these things together. How much does that piece cost? Pardon? How much does that piece cost? Well, this piece is worthless. A full string, Your Honor, I think is $700. A full string is $700? A full piece. A full piece? Yes. How big is the piece? The piece is 25 feet long. 25 feet long? Yes. Now, this is the most important part of the drilling operation and that's why this has to be put together in such a way. This is called heat shrink and welding. And what that means is that both pieces are machined out to a very fine tolerance. The drill pipe, the tubing, is then heated to such an extent that it expands and it fits over the tool head. At that point, it's cooled, contracts, and they come together and form a bond. And then there's a weld that's wrapped around it. So that's the basic science that's involved here. So it is important because the reason it's important is the Wallaces in this case early on made the decision to cover, to mitigate their damages by accepting the promises of Jeffco that said we can fix this. And Jeffco, and we have outlined in our brief, very detailed chronology of Jeffco's promises, send the pipe back to us. We'll test every piece. We'll fix the pieces that can be fixed and the other pieces we'll replace. And if there's nothing wrong, we'll tell you that too. But what about after it became apparent that that wasn't going to happen? That's a big part of the defendant's case, Your Honor. And as Judge Panner found, and there was substantially more evidence than the defendant has suggested here. By the time in November that it became, okay, the Wallaces received back this drill string, discovering that only two pieces had actually been inspected. And with an assurance that everything was fine. And at that point, they tried to use it in a small domestic well. It twisted off again. The twist occurs at this point right here where it's put together. At that point, and the evidence is that the Wallaces were just short of bankruptcy. They'd lost many of their biggest customers. And these cash sources that the defendant refers to, and Judge Panner found, and I think the jury was entitled to find, were evidence of financial desperation. In other words, with a huge tax penalty, Mr. Wallace is cashing in his IRA. They're selling their family home place in Missouri that had been in their family for a generation. They're borrowing money from their children. They're borrowing money on their credit card. He's cashing in, a man in his fifties is cashing in his life insurance so that they have money to continue to operate and to live on. And the most ironic thing of all, and the point that Tejepco makes with such force, is, well, they had a substantial sum of money because they had sold their new drill rig. Ignoring the fact that they purchased the new drill rig so that they could use this heavy-duty drilling equipment to drill the larger wells. And that's sort of like saying, sure, you had money to buy a new milking machine because you just sold your cow. And that's, in effect, what occurred in this case. At that point, they were in such dire straits that they could no longer... And that's what Judge Panner... I was going to say that's what Judge Panner found. That was not his job. He didn't find that. Judge Panner found that the jury was justified in finding that. And I think that's one of the things I wanted to make sure that I covered because especially when we get to damages here. Well, counsel, what's your response to opposing counsel's listing of the items that were purchased, the home improvements, the truck, the car, the patio, things of that nature? So what's your response to that in terms of the failure to mitigate argument made by opposing counsel? To the extent that the record says that certain items were purchased, a new truck for the business, a pickup truck for the business, a deck. It doesn't... I don't think the record says anything about whether that's credit card therapy or what. Certainly there's no suggestion that that's a cash purchase. It's a situation of people who on occasion faced with the heartbreak of going from a company that has a net profit of over $300,000 a year to near bankruptcy. And I think they made some purchases, and this was all presented to the jury, all presented to the jury on their financial wherewithal. And they made some purchases that other people might not have made in their circumstances. And the record does not show whether that was a credit card purchases or what. But basically when we get to the issue of the damages evidence in this case, I think your honors are correct. There were three damages experts presented to the jury. Defense counsel makes the point this testimony should have been excluded. He says these questions should have been taken from the jury. And I don't want to be too critical of perhaps some less than precise use of the language. We're not here on an evidentiary objection. There was no request for your Daubert hearing for the trial judge to do his gatekeeping function to make determinations. And there was, in fact, the argument that's made here, which is only one of three separate calculations of damages, that was never made in any pretrial motions in limine that they used an incorrect, that they should have used a, instead of using a logarithmic line, they should have used a parabolic line. They brought a witness in who said, I would have used a parabola instead of a log normal line. The jury was entitled to evaluate that. We had two witnesses, Mr. Dickey and Mr. Gilbert, who each said that this was a legitimate and appropriate method of determining damages. They brought in a witness that said it was not. As Judge Panner said in his opinion, that's what juries do. That's a jury's function, is to make those kind of determinations as to who is correct. But this issue, what the defendant's asking this court to do here, is hold a Ninth Circuit Daubert hearing. This was never presented pretrial, and ironically it was never presented post-trial. In fairness, counsel on appeal was not counsel at trial. But the arguments dealing with the inappropriate use of a particular parabola or log normal line were never presented at trial. Counsel, what is the nature of the motion to which opposing counsel refers when he says that the court did not rule on the motion? What motion is he referring to? Yes, there was a motion in limine, Your Honor, in addressing the expert's testimony. That motion in limine was made, and I think this is an important point, the motion in limine was made after the defendant had received the very substantial written expert reports of our experts. That motion was limited to addressing the question of whether the damages information was speculative because the experts had not ruled out other causes of the downturn in profits. Judge Fanner did rule on that motion. He specifically ruled on that motion. In fact, I cited in my brief his ruling, and he agreed with the defendants. He said, unless you can present evidence excluding other reasons for this profit loss, your expert testimony will not come in. Then at trial, taking a very broad hand from the judge at trial, the plaintiffs then offered expert testimony from four witnesses. Witnesses who said that the water well business was growing. That was one of Mr. Wallace's competitors, among others. Witnesses had said that Wallace's were first in their area, basically Umatillomoro County, Oregon, in competition until they purchased the Jeffco pipe. They had shown their ability to rise to the top of their competitors. Witnesses testifying that nothing in the industry, that there was nothing in the industry which would have inhibited the Wallace's from making a profit and continuing to be successful. That there was nothing in the Wallace's operation  That the Wallace's had an efficient operation. Mr. Ross testified that the other major problem that well drillers face is other equipment problems. He said that the Wallace's had less equipment problems than the other well drillers that he dealt with in the area, and he dealt with all of them. That was the basis of the motion in Lemony. The defendant was critical of our experts because our experts didn't testify to those factors. But it was entirely legitimate, in fact, much more appropriate to have a well driller, to have the largest farmer in the area,  the opportunities in well drilling, that sort of thing, than it was for a CPA or a business appraiser. So that was the issue that was raised on the motion in Lemony, and Judge Tanner agreed with the defendants, and that was the testimony that was brought in to answer that concern. The other issue that I wanted to raise again, and if Your Honor wanted to ask me what my strongest case was, I would answer that it's the... The one time we didn't ask that question. I was waiting, I sat here all day. But it's the Gasparini case, and it sets forth the roles of this court, the trial court, and the jury in ruling on these types of cases. What the court in Gasparini said was that after a judge, and certainly an experienced judge like Judge Tanner, sits in Pendleton for three days and hears this testimony, it is his role, and he is in the best position to evaluate motions for new trial. And they said, the Supreme Court said, quoting from, I think it was the Second Circuit, we must give the benefit of every doubt to the judgment of the trial judge. In this case, it's a plaintiff's position that this procedure work exactly as it was supposed to. All of the testimony was presented to the jury with no objections. That's kind of the irony of some of these arguments, with no objections. It was presented to the jury with no motion for directed verdict on these issues. And the jury arrived at its verdict. Then Judge Tanner reviewed in great detail the evidence in the case and wrote a 13-page opinion explaining why the defendant's arguments with regard to mitigation, with regard to failure to cover, with regard to damages, and with regard to other things that are no longer at issue in this appeal were not well taken. And he did that. His judgment in making that ruling and sitting there is entitled to the benefit of every doubt. And it is our position that there is nothing in this record which would show that Judge Tanner abused his discretion in making his ruling on this issue. I did want to add one point here, Your Honor, because I forgot it. On the cover issue, the defendant seems to continue to argue that they lost on the issue of cover. They didn't lose on the issue of cover. It was submitted to the jury. The jury was given a jury instruction that said that the Wallaces were only entitled to such damages, reasonable damages as could not have been prevented by cover. The testimony was from our experts, substantially over a million dollars in damages, and the jury came back at a lesser amount. And as Judge Tanner pointed out in his opinion, this was not a wholesale runaway cheering session for the plaintiff. They were awarded a little over half the amount that the evidence showed they had lost in this case. Well, how do you respond to opposing counsel's counter-argument that that begs the question, because the expert could have put in $10 million and the jury could have awarded half of that and it would not have been supported by the evidence? Well, Your Honor, that's the difficulty we have with the way this case is before this court. This is not a Daubert hearing. They're saying now that they're making arguments now that were not made, that were not addressed to Judge Banner. He didn't have an opportunity to hold a Daubert hearing because none was asked for. If in his gatekeeper role improper evidence had been submitted to the jury and they had used a whatever-he-called-it line, Judge Banner would have excluded it. We had two witnesses who said that this was a valid method of computing lost profits. It was not a... And Jim Dickey, who did this, testified that he in fact consulted with some very highly qualified statisticians in order to frame his plan. So this was not something that he said. To this day, because there was no proper request for a Daubert hearing or anything like that, except for the defense witness whose qualifications were... The jury was entitled to question her qualifications with not having any certifications or accounting degree or such, except for her saying that, I prefer a parabola or a parabolic line to a log-normal line. There's no testimony putting this into doubt. And we have two experts who said that. And really, and this is what Judge Banner said, that this argument is a reprise of the final argument in the trial, a final argument which the jury rejected. Thank you, counsel. Thank you, Your Honors. Big bottle. Thank you, Your Honors. With respect to the question of financial ability, I found Mr. Hallman's response to Judge Rawlinson's question about what about these $15,000 debt purchases and so forth. What was going on there? He said, well, it might have been, you know, sort of comfort credit card purchases. Well, the most comfort would have been to go out and to spend $40,000 or to borrow $40,000 and to stop the bleeding. And frankly, with respect to all of the explanations about why it is that they didn't have the financial ability, about how they were close to bankruptcy, about how they were borrowing money from IRAs and so on and so forth, I would suggest that that's not in the record. If you look in their red brief at pages 30 to 31, they talk about this question of financial wherewithal and there's no evidence there beyond their assertion that they couldn't afford it by Mr. Wallace. The Wallaces could have and should have mitigated. Their failure to do so resulted in massive profit losses, at least according to them, and it is not appropriate under the law of the State of Oregon to require JFCA to bear the burden of those losses. Thank you, Counsel. The case just argues and submitted and we are in recess for the day. All rise. Okay. Thank you. Thank you. Thank you.
judges: Alarcon, Ferguson, Rawlinson